UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA :

v. : No. 4:18CR267

BRIAN MELLOTT, :
              Defendant :

INDICTMENT

FILED
SCRANTON
AUG 14 2018
PER _____
DEPUTY CLERK

THE GRAND JURY CHARGES:

COUNT ONE
Conspiracy to Defraud the United States and to
Violate the Clean Air Act, 18 U.S.C. § 371

I. Introduction

At times material to the Indictment:

### Relevant Individuals and Entities

1. Rockwater Northeast LLC (Rockwater) was a company headquartered in Canonsburg, Pennsylvania, with facilities in the Middle District of Pennsylvania and the Western District of Pennsylvania. Rockwater provided services to the hydraulic fracturing industry in Pennsylvania, including the provision and transportation of water and wastewater. Rockwater was a downstream subsidiary of Rockwater Energy Solutions, Inc., a Houston, Texas-based company.

2. BRIAN MELLOTT was an Inventory & Logistics Analyst at the Rockwater facility located in Linden, Pennsylvania, within the Middle District of Pennsylvania.

3. The Environmental Protection Agency (EPA) was an agency of the United States responsible for enforcing and administering the Clean Air Act.

4. The Federal Motor Carrier Safety Administration (FMCSA) was an agency of the United States Department of Transportation (USDOT) responsible for regulating the safe and efficient travel of commercial motor vehicles. Companies that maintained commercial motor vehicles to transport passengers or haul cargo in interstate commerce were required to register with the FMCSA and obtain a USDOT number that served as a unique identifier.

5. Rockwater, when it was formerly known as Red Oak Water Transfer Northeast LLC, registered with FMCSA as an interstate carrier of oil field equipment and was assigned USDOT number 1893956.

## Emissions Systems and Regulations

6. The purpose of the Clean Air Act was to protect and enhance the quality of the nation's air resources, thus promoting public health and welfare by, among other things, reducing the emission of pollutants, such as nitrogen oxides, particulate matter, hydrocarbons, and carbon monoxide, from motor vehicles.

7. The Clean Air Act and its implementing regulations established standards limiting the emission of pollutants from various classes of motor vehicle engines, including heavy-duty diesel engines.

8. To meet emissions standards, manufacturers of vehicles bearing heavy-duty diesel engines installed a variety of hardware emissions control devices, including exhaust gas recirculation systems, selective catalytic reduction systems, and diesel particulate filters. After verifying that the emissions control devices conformed to emissions standards, the EPA issued Certificates of Conformity to vehicle manufacturers specific to each annual vehicle class.

9. To enforce compliance with emissions standards, the EPA, pursuant to its regulatory authority, created regulations requiring

manufacturers to install on-board diagnostic systems (OBDs) on vehicles. OBDs monitored emissions-related sensors and the hardware emissions control devices of heavy-duty diesel engine systems and components.

10. OBDs alerted vehicle operators, through a malfunction indicator light, when a component of the emissions-monitoring system deteriorated or malfunctioned. When the malfunction was left unaddressed and the vehicle's emissions exceeded certain emissions level thresholds, the OBD forced the vehicle's engine to shut down, or limited the vehicle to a maximum speed of as low as five miles per hour; an effect commonly referred to as "limp mode" or "power reduced mode."

11. Repairs for malfunctioning or deteriorating emissions systems on diesel vehicles in "limp mode" ordinarily cost between approximately $1,000 and $10,000. Repairs ordinarily took several days or weeks to complete, during which time the vehicles were inoperable.

12. The Clean Air Act prohibited any person from tampering with or rendering inaccurate vehicle emissions monitoring devices and

methods, including OBDs and hardware emissions control devices.

13. The FMCSA, pursuant to its regulatory authority, required commercial motor vehicles to pass annual inspections. The FMCSA delegated the administration of those inspections to certain states, including Pennsylvania, whose inspection standards met minimum federal standards.

14. In Pennsylvania, the Pennsylvania Department of Transportation (PennDOT) oversaw motor vehicle safety inspection programs. PennDOT, pursuant to its regulatory authority, required commercial diesel-powered motor vehicles to pass a safety inspection, and prohibited any device or modification that bypassed exhaust system emissions components. Pennsylvania prohibited the intentional modification or alteration of a factory-installed smoke control system on diesel-powered vehicles and their fuel systems that limited the system's ability to control smoke. Pennsylvania also prohibited removal of the smoke control system, except for repair or installation of a proper replacement. Pennsylvania further prohibited disabling, altering, and changing an emission control system of a vehicle, requiring all original

emissions control components to be present and functioning.

15. PennDOT required annual vehicle safety inspections to ensure that vehicles were maintained for safe operation. The safety inspection procedure included inspection and testing of a variety of vehicle components, including hardware emissions systems. Certified vehicle safety inspectors performed vehicle safety inspections at official PennDOT inspection stations. Certified vehicle safety inspectors affixed a certificate to vehicles that passed inspection, to demonstrate compliance with PennDOT inspection standards, and reported the inspection results to PennDOT.

## Emissions System Tampering Devices

16. Hardware emissions control devices and OBDs could be disabled on commercial vehicles bearing heavy-duty diesel engines, using a variety of aftermarket devices. Disabling the emissions control systems defeated their ability to limit pollutant gases and particulate matter into the atmosphere.

17. One method used to disable hardware emissions control devices was to remove the portion of the vehicle's exhaust system that

contain the emission control devices and replace it with a section of exhaust tubing or a "straight pipe" that did not limit emissions.

18. Another, generally less expensive method used to disable hardware emissions control devices was to remove certain components, such as the selective catalytic reduction system and diesel particulate filter, by hollowing out their casing in the vehicle's exhaust pipe, and then re-welding the entry point to create the false appearance that the hardware emissions control devices remained installed.

19. OBDs detected disabling modifications to the hardware emissions control devices on vehicles. Thus, any modifications to the hardware emissions control devices necessarily included a contemporaneous disabling of the OBD, to avoid the vehicle going into "limp mode."

20. The devices used to disable OBDs commonly were referred to as "defeat devices," "DPF defeats," "delete devices," "tuners," "performance tuners," "conversion kits," and "programmers," (collectively referred to as "defeat devices"). Several manufacturers offered a variety of defeat devices.

21. One type of defeat device was an apparatus that plugged into a vehicle's data link connector to "tune" the OBD. Those defeat devices, when plugged in, allowed the vehicle operator to activate at will the software modifications that manipulated the OBD.

22. Another type of defeat device was a software program that reprogrammed, or "flashed," the vehicle's diesel engine computer module, through use of a computer or electronic device that modified the OBD after being connected to the vehicle on a single occasion. Those defeat devices permanently adjusted the diesel engine timing and other parameters to bypass the OBD.

23. In addition to disabling the OBD, defeat devices also improved heavy-duty diesel engines' horsepower, torque, and fuel efficiency.

## II. Statutory Allegations

24. From on or about August 1, 2013, the exact date being unknown to the Grand Jury, and continuing thereafter until on or about March 29, 2016, in the Middle District of Pennsylvania, and elsewhere, the defendant,

BRIAN MELLOTT,

knowingly and willfully conspired, combined, confederated, and agreed with other persons both known and unknown to the Grand Jury, to:

    a. defraud the United States by impairing, impeding, obstructing, and defeating the lawful functions of the federal government, that is, the EPA's function of implementing and enforcing emissions standards for air pollutants for diesel vehicles under the Clean Air Act, and the FMCSA's function of implementing and enforcing annual inspections standards for commercial motor vehicles, by deceitful and dishonest means, in violation of Title 18, United States Code, Section 371; and

    b. violate the Clean Air Act by tampering with and rendering inaccurate monitoring devices and methods required pursuant to the Clean Air Act to be maintained and followed, in violation of Title 42, United States Code, Section 7413(c)(2)(C).

## Manner and Means

The objects of the conspiracy were accomplished, in part, by the following manner and means:

25. The co-conspirators agreed to reduce the repair costs and maintenance down time triggered by malfunctioning or deteriorating emissions systems on Rockwater commercial motor vehicles containing heavy-duty diesel engines.

26. The co-conspirators replaced and caused to be replaced hardware emissions control devices on Rockwater commercial motor vehicles containing heavy-duty diesel engines with exhaust tubing or "straight pipes."

27. The co-conspirators removed and caused to be removed hardware emissions control devices on Rockwater commercial motor vehicles containing heavy-duty diesel engines, by extracting the emissions control devices from their compartments, and then re-welding the entry point to create the false appearance that the hardware emissions control devices remained installed.

28. The co-conspirators arranged for Rockwater to purchase defeat devices from other co-conspirators.

29. The co-conspirators concealed and caused to be concealed the purchase of the defeat devices in purchase invoices and in Rockwater's books and records, including by mislabeling the defeat devices as "complete exhaust systems" and "replace exhaust systems."

30. The co-conspirators used and caused to be used defeat devices to disable the OBDs on Rockwater vehicles whose hardware emissions control devices had been removed.

31. The co-conspirators arranged and caused to be arranged for Rockwater vehicles with disabled OBDs and hardware emissions control devices, to undergo annual PennDOT vehicle safety inspections by other co-conspirators.

32. The co-conspirators issued and caused to be issued certificates stating that Rockwater vehicles with disabled OBDs and hardware emissions control devices met PennDOT inspection standards.

33. The co-conspirators submitted and caused to be submitted vehicle safety inspections reports to PennDOT stating that Rockwater vehicles with disabled OBDs and hardware emissions control devices had passed safety inspections.

## Overt Acts

In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Middle District of Pennsylvania and elsewhere:

34. Between on or about August 1, 2013 and June 30, 2014, the co-conspirators removed hardware emissions control devices from in excess of 30 Rockwater commercial motor vehicles containing heavy-duty diesel engines.

35. Between on or about September 1, 2013 and June 27, 2014, BRIAN MELLOTT and other co-conspirators arranged for the purchase of approximately 50 defeat devices and "straight pipes" by Rockwater from other co-conspirators.

36. On or about September 1, 2013, BRIAN MELLOTT approved the purchase of a defeat device in an invoice in which the defeat device was mislabeled "complete replacement exhaust."

37. On or about November 22, 2013, BRIAN MELLOTT approved the purchase of three defeat devices in an invoice in which the defeat devices were mislabeled "complete replacement exhaust systems."

38. On or about February 11, 2014, BRIAN MELLOTT approved the purchase of a defeat device in an invoice in which the defeat device was mislabeled "complete exhaust system."

39. Between on or about September 1, 2013 and June 30, 2014, the co-conspirators used defeat devices to disable the OBDs for in excess of 30 Rockwater vehicles whose hardware emissions control devices had been removed.

40. Between on or about September 1, 2013 and March 29, 2016, BRIAN MELLOTT and other co-conspirators transported Rockwater vehicles whose hardware emissions control devices had been removed and whose OBDs had been disabled to other co-conspirators, who

passed the Rockwater vehicles for annual inspection and reported the inspections to PennDOT.

All in violation of Title 18, United States Code, Section 371.

## THE GRAND JURY FURTHER CHARGES:

### COUNTS TWO THROUGH FOUR
### Violation of the Clean Air Act, 42 U.S.C. § 7413(c)(2)(C)

41. The factual allegations of paragraphs 1 through 33 are incorporated here.

42. On or about the dates listed below, in the Middle District of Pennsylvania, and elsewhere, the defendant,

### BRIAN MELLOTT,

aiding and abetting others, did knowingly falsify, tamper with, render inaccurate, and fail to install a monitoring device and method required to be maintained under the Clean Air Act, that is, the defendant approved the invoices listed below, with each being a separate count, to purchase defeat devices that were applied to diesel trucks:

| Count | Date of Invoice | Invoice Number | Invoice Amount | Invoice Description |
|---|---|---|---|---|
| 2 | September 1, 2013 | 255079 | $2,248.00 | Complete replacement exhaust for truck #185 a 2011 Chev 3500 |
| 3 | November 22, 2013 | 255118 | $6,016.08 | Complete replacement exhaust systems for three 2011 Chev Trucks |
| 4 | February 11, 2014 | 425135 | $2,229.00 | Complete exhaust system for a 2011 Chev Duramax |

All in violation of Title 42, United States Code, Section 7413(c)(2)(C), and Title 18, United States Code, Section 2.

A TRUE BILL

DAVID J. FREED
United States Attorney

Date: 8/14/18

By:

PHILLIP J. CARABALLO
Assistant United States Attorney

SEAN CAMONI
Assistant United States Attorney